IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISON

| | | |
|---|---|---|
| FELICIA N. SMITH, | ) | CASE NO. 3:20-CV-00004-JZ |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | United States District Judge |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF THE SOCIAL | ) | CARMEN E. HENDERSON |
| SECURITY ADMINISTRATION, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Defendant, | ) | |

**I. Introduction**

Plaintiff, Felicia N. Smith ("Smith" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Plaintiff's Statement of Errors and AFFIRM the Commissioner's decision.

**II. Procedural History**

On March 6, 2017, Claimant filed applications for DIB and SSI, alleging a disability onset date of December 15, 2015. The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). On July 27, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 11 at 689-749). On November 9, 2018, the ALJ issued a written

decision finding Claimant was not disabled.  (ECF No. 11 at 218).  The ALJ's decision became

final on October 31, 2019, when the Appeals Council declined further review.  (ECF No. 11 at 6).

On January 2, 2020, Claimant filed her Complaint to challenge the Commissioner's final

decision.  (ECF No. 1.)  The parties have completed briefing in this case. (ECF Nos. 12, 16, and

17).

Claimant asserts the following assignment of error: The ALJ failed to properly evaluate the

opinions of both medical experts hired by Social Security to personally examine Ms. Smith. (ECF

No. 12 at 2). Claimant further explained that she is not challenging whether the ALJ gave good

reasons for determining the weight given to the medical opinions; rather, she argues only that the

ALJ's weight determinations are not supported by substantial evidence. (ECF No. 17 at 5).

## III. Background

### A.  Relevant Hearing Testimony

The ALJ summarized the Claimant's testimony from the administrative hearing:

> The claimant, Felicia N. Smith, is a 42-year-old female who has
> alleged disability based on both physical and mental impairments.
> In reports to the agency, the claimant alleged that could not work
> due to back pain from a work injury, heart disease, stomach pain,
> painful swallowing, and short-term memory loss. (4E/2). At the
> hearing, the claimant testified that she hurt her back at a prior job
> and has had pain ever since. She also stated that she could not work
> due to left heel pain that gets to the point where she is unable to put
> pressure on the foot. Additionally, she testified that she gets muscle
> spasms in her stomach to the point where she cannot move; this
> occurs a few times per month. The claimant used to braid hair for
> income, but stated she stopped due to arthritis in her hands; she told
> her doctor about this a few days before the hearing. Moreover, the
> claimant testified that she has allergies that cause electric shocks in
> her face when she touches it; she does not get shocks when she is
> not touching her face. She also stated she has anxiety attacks about
> twice per week where she gets chest pain and shortness of breath.
> The claimant testified she has knee pain and believes she may take
> pills for that, but she is not sure since she takes so many pills. Lastly,
> she stated that she had diabetes for which she checks her blood sugar

in the morning before she eats and then two hours after she eats. The claimant testified that she does not really follow a diabetic diet because it is somewhat hard to do so.

The claimant took special education classes in high school and received her diploma. She testified that she could not read a newspaper, recipe, or signs at a store. For items that she must read, like court papers, she stated her son reads them to her. She stated she tried to go to adult reading classes, but got frustrated and gave up. The claimant testified that she could write a grocery list and copy words down. She further stated she can do some simple math, but has difficulty knowing how to make change. The claimant goes to her doctor's office for them to fill her pillbox because she stated she does not know how to dispense medication on her own.

Regarding activities of daily living, the claimant testified she goes to the grocery and rides in a motorized cart to do her shopping. The claimant is able to drive, but stated that one of her children usually will drive her. She also testified that she can vacuum by sitting down and scooting around on the floor, pushing the vacuum; she cannot stand up due to her back pain. For other household chores, the claimant stated that her son does the dishes most of the time, and the other children do all the other chores. She testified that she does not lift heavy things, like cases of water, because it makes her want to throw up. She stated she could lift a gallon of milk without problems. The claimant can look up recipes on YouTube and follow along to make a meal. She stated she could match the spelling after the ingredients are written down to make sure she is putting in the correct items. The claimant's son plays football, and she stated she only went to five of his games because she cannot breathe in the heat. For entertainment, the claimant watches television, but has difficulty staying focused.

(ECF No. 11 at 226-227).

**B.  Relevant Medical Evidence**

The ALJ also summarized Plaintiff's health records and symptoms:

The claimant reported to her primary care physician, Warren C. Morris, M.D., in January 2016 that she had numbness, tingling, and pain in the right side of her face for the past several weeks.  (3F/l). Examination of the claimant showed cranial nerves II-XII intact and no nystagmus present.  (3F/2). The claimant was diagnosed with mononeuritis. (3F/3). Additionally, the claimant was diagnosed with diabetes mellitus type 2. (Id.). She was ordered blood tests,

prescribed metformin and a Medrol dose pack. (Id.). At a follow up visit two weeks later, the claimant reported improvement in her facial pain from the steroid, but it was not completely resolved. (3F/9).

In June 2016, the claimant had a routine follow up visit with her primary care physician for her diabetes. (3F/42). The appointment notes state the claimant did not routinely check her blood sugar levels, and did not regularly follow a diabetic diet, despite receiving and understanding nutritional counseling in the past. (3F/42-43). Additionally, the claimant stated she was tolerating her diabetes medication well, and she reported no change in her symptoms. (3F/36). At an office visit in December 2016 for an unrelated matter, the claimant's AlC level was measured at 7.1, and she stated that she had not checked her blood sugar level since it was checked in May 2016. (3F/5 l). In April 2017, the claimant reported increase in fasting blood sugars and post-prandial blood sugars, and reported no new symptoms. (11F/2). Testing at the appointment showed AlC at 8.1, and it was noted again that the claimant did not follow a diabetic diet. (Id.).  The medical provider also indicated that the claimant was unsure of the medication she was taking, and they were not able to ascertain whether she was taking her diabetes medication regularly. (Id.).

The claimant returned to her primary care physician for a diabetes check in July 2017. (11/49).  Her AlC was 8.5, and the claimant stated she did not check her blood sugars. (Id.). When she returned the following month, August 2017, the claimant reported checking her blood sugar three times per day, and she brought log sheets in which she recorded the numbers. (l7F/2). The provider noted that her readings are mostly at goal (less than 180), but she did have a high reading of 380 for which it seemed like she ran high in the mornings. (Id.). The claimant was encourage[d] to eat a balanced diet and to get exercise. (Id.). In October 2017, the claimant's AlC was down to 7.6. (l7F/4). The claimant stated she was drinking more water, and had stopped drinking regular pop.  (Id.). In November 2017, the claimant stated she experienced increased blood sugar levels after she ran out of her medication for about 12 days. (l 7F/39). It was noted that this was the likely reason for the increase. (Id.). At her next appointment in December 2017, the provider stated the claimant's blood sugar levels were controlled, despite her being out of her medication for two days this time. (l 7F/44). The claimant stated she only checked her levels once per day, and she did not bring her logs to the appointment. (Id.). The claimant's AlC level rose to 10.1 in February 2018. (22F/l 7). She stated that she was drinking a lot of pop (at least three cans per day and sometimes a

4

two liter), eating a lot of carbohydrates, and was not eating vegetables. (22F/9, 17). It was recommended the claimant start on basal insulin, but she stated she was afraid of needles, so she would like to make changes to her diet instead. (22F/l 7). Additionally, the claimant was out of her medication for about 10 days, and that before she ran out she was taking a pill out of each bottle every morning, unsure of which medication she was taking. (Id.).

In an April 2018 appointment with a social worker, it was noted the claimant was still running out of her medicines due to lack of transportation to get them refilled. (22F/30). The claimant stated her blood sugars were reading in the 400 and 500 range. (Id.).

Obesity and its effects were also considered when evaluating disability, as the combined effects of obesity can increase the effects of other impairments (Social Security Ruling 02-1p). During the hearing, the claimant stated that she was 5' 11" tall and weighed 321 pounds. This corresponds to a body mass index (BMI) of 44.8, which is categorized as Level II obesity (Social Security Ruling 02-1p citing Clinical Guidelines[1] on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998)). The claimant's obesity has been considered under the aforementioned listings and I find there is no indication that the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of listing-level severity.

Prior to the alleged onset date, the claimant received a psychological consultative examination on May 13, 2014 by Albert E. Virgil, Ph.D. (2F). The claimant was administered the Wechsler Adult Intelligence Scale test (WAIS-IV) for which Dr. Virgil stated the results appeared to be a valid indication of her intellectual functioning level at the time. (2F/4). The test results revealed Borderline Intellectual Functioning (BIF). (Id.).

(ECF No. 11 at 227-228).

Recognizing that Claimant had not produced any evidence or medical records from an

---

[1] Footnote [1] of the ALJ's decision reads: "For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as 'overweight' and a BMI of 30.0 or above as 'obesity.' The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed 'extreme' obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40." (ECF No. 11 at 228, n.1).

acceptable medical source, the ALJ requested that Claimant undergo both physical and psychological consultative examinations at the agency's expense.

On August 22, 2018, Claimant attended a forensic psychology consultative examination with clinical psychologist Regina McKinney, Psy.D. (ECF No. 11 at 1588-1599). During the examination, McKinney noted that Claimant appeared anxious and depressed, complained of being too warm in the office, and did not appear to exaggerate or minimize her difficulties. (ECF No. 11 at 1595). McKinney noted Claimant's thought processes were "shallow and concrete"; her "receptive language skills were marginally adequate", and "[t]here were no abnormalities of mental content observed." (ECF No. 11 at 1595). With respect to Claimant's mood and affect, McKinney noted that she "had a downcast facial expression" and her affect was restricted. (ECF No. 11 at 1595).  Regarding Claimant's sensorium and cognitive functioning, McKinney stated Claimant Ms. Smith was fully oriented; recalled 5 digits forward and 2 digits backward; recalled zero out of 3 words after a 5-minute time delay and was unable to complete any iterations of serial sevens or serial threes. (ECF No. 11 at 1595). With respect to her insight and judgment, McKinney observed that Claimant's "judgment appears to be sufficient for her to make decisions affecting her future and to conduct her own living arrangements efficiently. She appears to have adequate insight into her difficulties." (ECF No. 11 at 1596). Following the examination, McKinney diagnosed Smith with the following: 1) borderline intellectual functioning (estimated); 2) major depressive disorder, recurrent, moderate; and 3) generalized anxiety disorder. (ECF No. 11 at 1596). McKinney also completed a functional assessment. (ECF No. 11 at 1596-1597).

On August 28, 2018, Claimant attended a physical consultative examination with Mark E. Weaver, M.D. (ECF No. 11 at 1600-1617). Weaver's physical exam "revealed a well-developed overly-nourished 42-year-old female who ambulated with a stiffened gait and a left limp

6

complaining of left lower back pain. She did not use any ambulatory aids, braces, or other special equipment in the exam today. She did not become short of breath or complain of chest pain after walking 40 feet up and down the hallway in the clinic or after performing physical activities in the exam." (ECF No. 11 at 1602). Claimant registered at 5'10", 314 lbs with a BMI of 45. (ECF No. 11 at 1602). Her blood pressure was 110/80, pulse rate was 92 beats/minute (regular), and her respirations measured at 16/minute, regular and unlabored at rest. (ECF No. 11 at 1602). Observations of her head, neck, chest, heart and circulatory, and abdomen were all normal. (ECF No. 11 at 1603). Examination of Claimant's hands showed "no intrinsic muscle atrophy. Grip strength testing by dynamometer x3 averaged 24-kg left hand but showed give way averaging 12 kg   right hand with finger pain inhibition. Grasp, manipulation, pinch, and fine coordination activities were normal in the left hand but abnormal in the right-hand being slow and hesitant with decreased coordination and finger pain." (ECF No. 11 at 1604). Weaver noted involuntary muscle spasms of Claimant's lumbar muscles and overall normal range of motion with the exception of Claimant's dorsolumbar spine. (ECF No. 11 at 1608-1609). The straight leg raise test for radicular sciatica type pain was "negative on the right leg at 90 [degrees]elevation but positive on the left leg at 60 [degrees] elevation." (ECF No. 11 at 1604). Weaver noted that Claimant had some concentration difficulty and difficulty following directions during the exam. (ECF No. 11 at 1605).

Following the exam, Weaver diagnosed Claimant with: 1) probable concentration difficulty, etiology unknown; 2) probable chronic right-hand pain status/post contusion injury age 13; 3) probably chronic asthma; and 4) probable chronic low back and radicular left lower extremity pain, possible degenerative disc disease by medical history. (ECF No. 11 at 1605).

## C.  Opinion Evidence

### 1.  State Agency reviewing consultants

Claimant does not challenge the weight given to the opinions of the State Agency reviewing consultants.[2] The ALJ summarized these opinions and his findings as follows:

> [T]he claimant was evaluated by State agency medical consultants at the initial and reconsideration level of review. (1A, 2A, 5A, 6A). The physical opinions at both levels state the claimant had postural limitations of occasionally climbing ramps and stairs, stooping, kneeling, crouching, and crawling; never climb ladders, ropes, or scaffolds; and environmental limitations to avoid concentrated exposure to cold and heat, and to avoid all exposure to hazards. (lA/9, 2A/9, 5A/9, 6A/9). Additionally, both psychological opinions state the claimant is moderately limited to carry out detailed instructions and with the ability to work in coordination or in proximity to others without being distracted. (lA/11, 2A/l l, 5A/11-12, 6A/l l-12).

(ECF No. 11 at 230). The ALJ gave the opinions "significant weight" finding that they are "consistent with the medical evidence in the record" and incorporated them into the RFC assessment. (ECF No. 11 at 230). Additionally, the ALJ gave little weight to "the opinion that the claimant can work at the light exertional level since additional medical evidence submitted after these opinions were rendered reflect the claimant is more limited than these opinions account for." (ECF No. 11 at 230).

---

[2] The Commissioner suggests that by challenging the weight given to the consultative examiners opinions in relation to that given to the State Agency opinions, Claimant indirectly challenges the weight of the State Agency opinions. (ECF No. 16 at 12). Claimant replied that the Commissioner's suggestion "is a mischaracterization of the alleged error." (ECF No. 17 at 5). Claimant argues that despite having the State Agency physicians' opinions prior to the hearing, the ALJ "found that it was necessary to order post-hearing consultative examinations, and yet he virtually ignored the entirety of those opinions when weighing the medical opinions in the record. There appears to be no valid purpose for this expense if the agency almost entirely ignores the opinions, especially when the consultative examiners' opinions were consistent with the record as a whole." (ECF No. 17 at 5). Considering the sole issue raised by Claimant and the Claimant's explanation, Claimant has not challenged the weight given to the State Agency reviewing physicians.

### 2.  Courtney Baller, Certified Nurse Practitioner

Claimant does not challenge the weight given to Baller's opinions. The ALJ summarized

Baller's opinions as follows:

> Two medical source statements were completed by Courtney Baller,
> CNP on June 21, 2018 and June 22, 2018. (19F, 20F). In the physical
> statement, Ms. Baller opined the claimant could rarely lift or carry
> one to ten pounds and could never lift or carry anything over eleven
> pounds. (19F/l). She further opined the claimant could never bend,
> crouch, squat, crawl, or climb ladders, and could occasionally climb
> stairs. (19F/2). In the psychological statement, Ms. Baller opined the
> claimant has no limitations with working in proximity with others
> or responding appropriately to co-workers or peers. (20F/l). She
> further opined the claimant had marked limitations with the ability
> to accept instructions from or respond appropriately to criticism
> from supervisors. (Id.). Finally, Ms. Baller stated the claimant had
> moderate limitations with her ability to relate to the general public
> and maintain socially appropriate behavior. (Id.).

(ECF No. 11 at 229). The ALJ gave Baller's opinions limited weight explaining that:

> Because a nurse practitioner does not qualify under the definition of
> "acceptable medical source," as defined in 20 CFR §404.1502 and
> § 416.902, the opinion is, pursuant to 20 CFR §404.1527 and
> §416.927, not a "medical opinion."  Thus, the opinion is considered
> only to the extent that it helps understand how an impairment affects
> the ability to work; the opinion cannot establish the existence of a
> medically determinable impairment (20 CFR §404.1513(e) and
> 416.913(e)). Additionally, Ms. Baller's opinions are primarily a
> checklist that provides functional limitations but without any
> supporting analysis, and are inconsistent with the other opinions in
> the record. Given the above, these opinions are given limited weight.

(ECF No. 11 at 230).

### D.  Post-hearing Social Security consultative examinations

### 1.  Dr. McKinney, Social Security examining psychologist – August 22, 2018

On August 22, 2018, McKinney completed a medical source statement following her

examination of Claimant. With respect to Claimant's ability to understand, remember, and carry

out instructions, McKinney opined that Claimant had moderate limitations in her ability to

understand, remember, and carry out simple instructions, and her ability to make judgments on simple work-related matters. McKinney opined that Claimant had marked limitations when those related to complex instructions and work-related matters. (ECF No. 11 at 1589). McKinney explained that Claimant needed questions simplified and rephrased, had limited short-term memory skills (could only recall two digits backwards), and has a history of special education classes. (ECF No. 11 at 1589).

McKinney also opined that Claimant had moderate limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting but marked limitations in her ability to interact appropriately with the public, supervisors, and coworkers. (ECF No. 11 at 1590). McKinney explained that Claimant appeared anxious and depressed and made minimal eye contact. (ECF No. 11 at 1590).

In reaching her conclusions, McKinney relied on her examination of claimant and her review of the records provided to her: the psychological evaluation conducted by A.E. Virgil, Ph.D., JD; and the medical source statement completed by Courtney Baller, Certified Nurse Practitioner, on June 22, 2018.

The ALJ gave McKinney's opinion "some weight" explaining that "[t]he medical evidence supports the claimant is significantly limited with performing and understanding complex tasks due to her diagnosis of [Borderline Intellectual Functioning]. However, the evidence does support that the claimant is able to understand and perform simple, routine tasks such as, using a blood-glucose meter to test her blood sugar on a daily basis, knowing what foods are detrimental to her Type 2 diabetes, cooking by following YouTube video recipes, and caring for her minor children." (ECF No. 11 at 229).

### 2. Dr. Weaver, Social Security examining physician – August 28, 2018

In his clinical summary, Weaver stated:

> in view of her concentration difficulties, low back problems, asthma, and right-hand problems, and radicular left lower extremity problems, all compounded by her problem of being overweight (BMI=45), she would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, climbing, lifting, carrying, handling objections with the right hand, following directions, travel, and operating environments containing excessive smoke, odors, dust, heat, humidity, and chemical aerosols. She would probably be able to perform physical activities involving handling objects with the left hand, speaking, and hearing.

(ECF No. 11 at 1605). Weaver also completed a medical source statement in which he opined that Claimant could occasionally carry or lift up to 10 pounds. (ECF No. 11 at 1611). Weaver opined that Claimant could sit for 30 minutes at a time, stand for 30 minutes at a time, and walk for 30 minutes at a time. For a total eight-hour workday, Weaver opined that claimant could sit for a maximum of four hours, stand for a maximum of three hours, and walk for a maximum of one hour. (ECF No. 11 at 1612). Weaver opined that Claimant would have frequent use of her hands with the exception of occasional use of her right hand for fingering and handling. (ECF NO. 11 at 1613). Weaver opined that Claimant has frequent use of her right foot but occasional use of her left foot and that she could occasionally climb stairs or ramps but never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (ECF No. 11 at 1613-1614). Finally, Weaver opined that Claimant could not walk a block at a reasonable pace on rough or uneven surfaces. (ECF No. 11 at 1616).

The ALJ gave significant weight to Weaver's opinion "that due to the claimant's obesity, she would probably be limited in sustained sitting, standing, walking, climbing, lifting, carrying objects, working in environments with excessive smoke, odors, dust, heat, humidity, and chemical aerosols. (25F/6)." (ECF No. 11 at 230). The ALJ explained that "[t]his opinion is consistent with the medical evidence and the claimant's statements, and have been incorporated into the residual

functional capacity assessment." (ECF No. 11 at 230). The ALJ gave little weight "to the opinion

that the claimant could not handle objects in her right hand because there is no indication in the

medical evidence that the claimant treated for right-hand pain." (ECF No. 11 at 230).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3.   The  claimant has the following severe impairments: obesity; diabetes mellitus; trigeminal neuralgia; and borderline intellectual functioning. (20 CFR 404.1520(c) and 416.920(C)).

5.   After careful consideration of the entire record, I find that the claimant has the residual  functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and  416.967(a)  except: she can occasionally climb ramps and stairs, never climb ladders, ropes, scaffolds;  occasionally balance and stoop, occasionally kneel, crouch and crawl; avoid concentrated  exposure  to extreme heat and cold, must avoid all exposure to hazards. She can understand, remember, and  carry out simple instructions;  Perform simple, routine, and repetitive tasks but not at a  production rate pace such as an assembly line; adapt to routine changes in the workplace that are  infrequent and easily explained; interact occasionally with supervisors, coworkers, and the general public; no work in which  reading, writing or math are essential job functions.

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V. Law & Analysis

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.

Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g).

"[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Discussion

Claimant raises one issue on appeal: whether the ALJ properly evaluated the opinions of both medical experts, McKinney and Weaver, hired by Social Security to examine Claimant.

Claimant acknowledges that the consultative examining sources are not "treating sources" entitled to controlling weight. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1502; *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) ("A 'nontreating source' (but examining source) has examined the claimant 'but does not have, or did not have, an ongoing treatment relationship with' [him].")). Instead, consultative examiners, such as McKinney and Weaver, are "other medical sources", requiring the ALJ to consider several factors when determining the weight to give the opinions. *Id.* These factors include the length and nature of the relationship, evidence that the physician offered in support of his or her opinion, whether the opinion is consistent with the record as a whole, whether the physician was practicing in his or her specialty, and other factors such as the sources familiarity with claimant's history and record. *Id.*; 20 C.F.R. § 404.1527(c).

13

Claimant argues that he ALJ's weighing of the opinions of McKinney and Weaver is not supported by substantial evidence. Specifically, Claimant argues that the ALJ's decision not to give more weight to McKinney and Weaver contradicts his very decision to require the consultative examinations. Claimant states: "[t]here appears to be no valid purpose for this expense if the agency almost entirely ignores the opinions, especially when the consultative examiners' opinions were consistent with the record as a whole." (ECF No. 17 at 5).

As an initial matter, Claimant has not provided any authority that by requesting that a claimant undergo a consultative examination that the ALJ has an obligation to adopt the opinion of the examiner. Claimant asserts that the ALJ ordered the examinations because the record before him did not contain enough information to make a disability determination. However, nothing in the transcript indicates that the ALJ *needed* the examinations in order to reach a conclusion.

During the hearing, the ALJ and Claimant's attorney discussed the ALJ's decision to order consultative examinations:

> ALJ: Okay. Thank you. All right. Mr. Cole, the impairments that are mostly described in this record, it didn't -- that I saw, none of them are from, you know, acceptable medical source, at least –
>
> ATTY: Right.
>
> ALJ: -- under the old rules. So --
>
> ATTY: The -- C-M-P's, and so forth.
>
> ALJ: Pardon me?
>
> ATTY: Mainly C-M-P's and so forth, yes, sir.
>
> ALJ: Yeah, so I'm send her for a psych CE
>
> ATTY: Okay. Sure. well, I was definitely -- I'm going to a --
>
> ALJ: -- for sure. And now I think I should send her for

14

> ATTY:  Both a physical and --
>
> ALJ:  -- I'M -- yeah, physical --
>
> ATTY:  Okay.
>
> ALJ:  -- CE too, okay.
>
> ATTY:  Sure.  We have no objection to that.

(ECF No. 11 at 740-741). Prior to the conclusion of the hearing, the ALJ explained:

> Okay.  All right.  Then, ma'am, this concludes your hearing.  I'm going to hold the record open till we have you go out for those appointments and the results of those come back. So that may take a couple months. Once the record is -- once those come in and the record's closed, then I will issue a written decision probably three to six months after that.  But if there's any other evidence you're aware of, whether it helps or hurts your case, you must supply it to us, and your attorney must help you with that. And I'll issue a written decision, you know, as I said, as soon I can.  And you'll get a copy[.]

(ECF No. 11 at 474). This exchange merely demonstrates that the ALJ recognized that Claimant *had failed to provide any records or an opinion from an acceptable treating medical source* and sought to get more information prior to reaching a determination. Claimant does not cite to any case law requiring an ALJ to accept the results or opinions of consultative examiners.

Moreover, Claimant's suggestion runs afoul of the standards in the Code of Federal Regulations, which support that and ALJ has the ability to request a consultative examination for a variety of reasons and upon receipt of that report, the ALJ must weigh the opinion accordingly.

> A consultative examination is a physical or mental examination or test purchased for you at our request and expense from a treating source or another medical source, including a pediatrician when appropriate. The decision to purchase a consultative examination will be made on an individual case basis in accordance with the provisions of §§ 404.1519a through 404.1519f. Selection of the source for the examination will be consistent with the provisions of § 404.1503a and §§ 404.1519g through 404.1519j. The rules and procedures for requesting consultative examinations set forth in §§

15

> 404.1519a and 404.1519b are applicable at the reconsideration and
> hearing levels of review, as well as the initial level of determination.

20 C.F.R. § 404.1519. The regulations explain that a consultative examination may be required in

several instances including "to resolve an inconsistency in the evidence, or when the evidence as

a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R.

§ 404.1519a. "If the evidence in [a] case record is insufficient or inconsistent, we may need to take

the additional actions in paragraphs (b)(1) through (4) of this section" which include asking the

claimant to undergo a consultative examination at the agency's expense. 20 C.F.R. § 404.1520b.

The agency then reviews the consultative examination report consistent with the factors set forth

in 20 C.F.R. § 404.1519p:

> (1) Whether the report provides evidence which serves as an
> adequate basis for decision making in terms of the impairment
> it assesses;
>
> (2) Whether the report is internally consistent; Whether all the
> diseases, impairments and complaints described in the history
> are adequately assessed and reported in the clinical findings;
> Whether the conclusions correlate the findings from your
> medical history, clinical examination and laboratory tests and
> explain all abnormalities;
>
> (3) Whether the report is consistent with the other information
> available to us within the specialty of the examination
> requested; Whether the report fails to mention an important or
> relevant complaint within that specialty that is noted in other
> evidence in the file (e.g., your blindness in one eye,
> amputations, pain, alcoholism, depression);
>
> (4) Whether this is an adequate report of examination as compared
> to standards set out in the course of a medical education; and
>
> (5) Whether the report is properly signed.

20 C.F.R. § 404.1519p.

There is simply nothing in the regulations that requires the ALJ to adopt the findings of a consultative examination simply because he requested that Claimant undergo the examinations at the agency's expense.

Next, we turn to whether the weight given to each of the consultative examiners' opinions was supported by substantial evidence. Claimant argues that the ALJ erred by giving the examining physicians' opinions less weight than the non-examining State Agency consultants' opinions.

Generally, an examining source opinion will receive more weight than to the opinion of a source who has not examined the claimant. *Id.*; 20 C.F.R. § 404.1527(c)(1); *see also Smith*, 482 F.3d at 875. However, the Sixth Circuit holds that giving greater weight to a State Agency consultant's opinion over an examining or treating source is "not, in and of itself, error." *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007). Instead, "[i]n appropriate circumstances, opinions from State [A]gency medical ... consultants … may be entitled to greater weight than the opinions of treating or examining sources." *Id.* (*citing* Soc. Sec. Rul. 96–6p, 1996 WL 374180, at \*3).

For medical sources who offer opinions but are not treating physicians, an ALJ is to consider the factors set forth in 20 C.F.R. § 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). Although "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. As Claimant recognizes, an ALJ need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Smith*, 482 F.3d at 876 ("[T]he SSA requires ALJs to give reasons for only treating sources."). ALJs must only provide a

17

meaningful explanation regarding the weight given to particular medical source opinions. *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019); *see* SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions."); 20 C.F.R. § 416.927(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion").

Here, the ALJ properly considered the consultative examiners opinions and substantial evidence supports the weight given to each.

### 1. McKinney

The ALJ summarized McKinney's opinion and assigned it "some weight", explaining:

> The medical evidence supports the claimant is significantly limited with performing and understanding complex tasks due to her diagnosis of BIF. However, the evidence does support that the claimant is able to understand and perform simple, routine tasks such as, using a blood- glucose  meter to test her blood sugar on a daily basis, knowing what foods are detrimental to her Type 2 diabetes, cooking by following YouTube video recipes, and caring for her minor children.

(ECF No. 11 at 229). Claimant argues that the ALJ erred by failing to "properly consider and evaluate all of the medical expert's opinions." (ECF No. 12 at 14). However, the Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion. *See Martin,* 658 F. App'x at 259 ("Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement

is inapplicable to their opinions."). All that was required was for the ALJ to "say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (citation and internal quotations omitted).

The ALJ did that here. He reviewed McKinney's opinion and agreed with it to the extent it found limitations with Claimant's performing and understanding complex tasks due to her diagnosis of BIF. He disagreed with McKinney's opinion that Claimant is moderately limited in her ability to understand and perform simple routine tasks. The ALJ then incorporated these limitations in the RFC by including that that Claimant: "can understand, remember, and carry out simple instructions;  Perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained[.]" (ECF No. 11 at 225).

Substantial evidence supports the ALJ's mental RFC analysis. The medical records and Claimant's own testimony indicate that she is able to carry out and understand simple routine tasks such as regularly testing her blood sugar, understanding which foods are detrimental to her Type 2 diabetes, cooking by watching YouTube video recipes, and caring for her minor children. She is able to drive (though prefers not to) and use a motorized cart. These are all valid reasons supporting the ALJ's RFC. *See Trischler v. Comm'r of Soc. Sec.*, Case No. 14-12867, 2015 WL 5016600, at *10 (ability to follow a recipe evidence supporting ALJ's decision to deny benefits for alleged mental limitations); *Ware v. Comm'r of Soc. Sec.*, No. 2:17-CV-01015, 2019 WL 696945, at *12 (S.D. Ohio Feb. 20, 2019) (caring for children requires concentration, persistence, and pace); *Doornbos v. Comm'r of Soc. Sec.*, No. 17-1464, 2017 WL 8948744, at *6 (6th Cir. Dec. 13, 2017). (driving requires "fair amount of concentration, persistence, and pace"). Additionally, based on their expertise and review of the Claimant's medical records, the State Agency reviewing

19

psychologists, whose opinions the ALJ gave significant weight, opined that Claimant is able to: 1) understand, remember, and follow one to two or one to three step instructions; 2) "perform work in a setting free of strict production demands/time deadlines secondary to BIF, anxiety, and depression"; and 3) "work in a setting where changes are infrequent and easily explained". (ECF No. 11 at 836-838, 853-855).

On this record, it is not difficult to conclude that there is sufficient "relevant evidence" that "a reasonable mind might accept as adequate to support" the ALJ's mental RFC analysis. *Rogers*, 486 F.3d at 241 (citation and internal quotation marks omitted). The ALJ did not err here as a result.

### 2. Weaver

With respect to Weaver's examination and opinion, the ALJ summarized:

> The claimant received a physical consultative examination on August 28, 2018 by Mark E. Weaver, M.D. (25F). Partial weight is given to this opinion. Significant weight is given to the opinion that due to the claimant's obesity, she would probably be limited in sustained sitting, standing, walking, climbing, lifting, carrying objects, working in environments with excessive smoke, odors, dust, heat, humidity, and chemical aerosols. (25F/6). This opinion is consistent with the medical evidence and the claimant's statements, and have been incorporated into the residual functional capacity assessment. Little weight is given to the opinion that the claimant could not handle objects in her right hand because there is no indication in the medical evidence that the claimant treated for right-hand pain.

(ECF No. 11 at 230).

Claimant acknowledges that the ALJ "need not discuss every piece of medical evidence nor must the ALJ adopt specific opinions" but asserts that the ALJ erred by failing to engage "in some sort of explanation" regarding Weaver's opinions given the ALJ being the one who requested the consultative examination. (ECF No. 12 at 11-12). As explained above, an ALJ's obligation to

explain his decision regarding a non-treating physician's opinion is not heightened because he is the one who ordered the examination.

Here, the ALJ gave significant weight to the limitations regarding Claimant's ability to sit, stand, walk, climb, lift, carry objects, and work in certain environments given her obesity in connection with her other impairments. The RFC reflects those limitations: "claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: she can occasionally climb ramps and stairs, never climb ladders, ropes, scaffolds; occasionally balance and stoop, occasionally kneel, crouch and crawl; avoid concentrated exposure to extreme heat and cold, must avoid all exposure to hazards." (ECF No. 11 at 225). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a). By limiting Claimant to sedentary work, the ALJ included the majority of Weaver's limitations in the RFC – even though perhaps not specifically addressed in his decision.

Finally, Claimant takes issue with the ALJ giving little weight to Weaver's limitations regarding her ability to use her right hand. Claimant argues evidence exists in the medical records showing that she was limited with her right hand. (ECF No. 12 at 13 (referring to the opinions of her nurse practitioner and a test performed by Weaver)). The Commissioner correctly points out that "there are no objective measurements such as EMGs or other conductivity tests showing such limitations with her hands. 20 C.F.R. §404.1513. There are no examination records from Dr. Morris or Baller identifying hand limitations; in fact, Dr. Baller's June 2018 opinion actually found

21

Plaintiff could frequently reach, handle, and finger with both hands. (Tr. 1525-26). There are not even complaints in the record until Plaintiff's testimony in July 2018 that she only recently stopped braiding hair because of arthritis in her hands. (Tr. 221, citing 700, 714)." (ECF No. 16 at 16 (See ECF No. 11 at 1530-1531, 705, 719)). Accordingly, substantial evidence supports the ALJ's decision and "a reasonable mind might accept as adequate to support" the ALJ's physical RFC analysis. *Rogers*, 486 F.3d at 241 (citation and internal quotation marks omitted). The ALJ did not err here as a result.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Plaintiff's Statement of Errors and AFFIRM the Commissioner's decision.

DATED: December 21, 2020

> *Carmen E. Henderson*
> Carmen E. Henderson
> United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas* v. *Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).